**Leroy GARRETT, trading as Garrett Broadcasting Service (WEUP), Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, Appellee.**

**No. 73–1840.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 28, 1974.

Decided June 2, 1975.

---

Nathaniel F. Emmons, Washington, D. C., with whom Eugene F. Mullin, Washington, D. C., was on the brief, for appellant.

Daniel M. Armstrong, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, at the time the brief was filed, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., were on the brief for appellee.

Before McGOWAN and ROBINSON, Circuit Judges, and WEIGEL,* United States District Judge for the Northern District of California.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

### SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal emanates from the Federal Communications Commission's denial of an application seeking authority to construct facilities enabling a radio station to change from daytime-only to un-limited-time broadcasting. The reason for the denial was the Commission's view that the applicant was unable to fully comply with the Commission's rule prescribing the minimum coverage of the city of license which the service applied for must provide. Among the questions tendered for our decision are whether, in holding that the rules intercepted the applicant, the Commission remained faithful to relevant but unmentioned precedents, and whether, in denying the applicant a waiver of the rules, the Commission gave proper weight to the fact of black ownership and operation of the applicant's station. Answering both questions in the negative and reaching no other issue, we remand the case to the Commission for further consideration.

I

Radio Station WEUP, licensed to Garrett Broadcasting Service,[1] transmits from Huntsville, Alabama, on 1600 kHz with 5-kilowatt power on a daytime-only basis. Station WRBN, licensed to WRBN, Inc., broadcasts daytime-only on 1600 kHz with 1-kilowatt power from Warner Robins, Georgia, 220 miles southeast of Huntsville. Each licensee applied to the Commission for a permit authorizing construction of a 500-watt directional facility for nighttime use.

The Commission consolidated the two applications for comparative hearing,[2] following completion of which an administrative law judge concluded that WEUP's proposed nighttime service would not meet the Commission's coverage rules[3] and that the attendant circumstances did not warrant a waiver of their demands.[4] Although WRBN's project likewise fell short on coverage, the judge deemed its showing on that

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d) (1970).

1. Garrett Broadcasting Service is a sole proprietorship owned by appellant Leroy Garrett. See Part III, *infra*.

2. Leroy Garrett, No. 19258 (June 17, 1971). The Commission explained that "[t]he applications are mutually exclusive in that a grant of

the [WEUP] application would raise WRBN's RSS nighttime limitation (above that received from existing stations) to such an extent that it would fail to cover a substantial portion of Warner Robins." *Id.*

3. See text *infra* at notes 9–11.

4. Leroy Garrett, 38 F.C.C.2d 117, 124–125 (1972) (initial decision).

score substantial enough to justify waiver of the deficiency.[5] On administrative appeal the Commission's Review Board sustained these positions,[6] and the Commission, one member dissenting, declined further review.[7] The appeal to this court[8] followed, presenting solely the question whether the rulings on coverage and waiver were free from error.

When WEUP filed its application, the Commission required "[t]he transmitter

**5.** The administrative law judge said:

WRBN would operate from a transmitter site within the corporate city limits of Warner Robins in the northwest sector some 2 miles from the center of the city. If granted alone, the proposed 11.26 mv/m contour would encompass 92.4% of the population and 89.4% of the area of the city of Warner Robins. If granted simultaneously with the [WEUP] proposal, the proposed 14.54 mv/m contour would encompass 81.4% of the population and 77% of the area of the city. The present transmitter site is considered near to being optimum for coverage of the city. In view of the fact that the WRBN proposal would provide the second nighttime aural transmission outlet and the first nighttime competitive voice in Warner Robins, it is concluded that, with 92.4% coverage of the city population, a waiver of [the coverage rules] is warranted.

*Id.* at 125 (citations omitted).

**6.** The Review Board said:

The first question involves Garrett's contention that the public interest requires that Rule 73.30(c) be waived because its proposal would provide a first AM primary service to 12,689 persons in Huntsville and Madison and the maximum number of AM services within the proposed service area is three. The Board does not believe that these factors warrant waiver for the following reasons: First, the grossly inadequate coverage leaves unserved over one-fourth of the population and one-half of the area of Huntsville—the city of license. Second, as noted by the Presiding Judge, the minimum number of combined aural (AM and FM) reception services within the total proposed service area of Garrett is three; moreover, even this situation occurs in an area where only 159 persons are involved. The maximum number of combined aural services is eight. In this regard, it is important to note that in recent Commission pronouncements there is an emphasis of treatment of AM and FM as a single aural service in evaluating unserved or underserved areas. *Cf.* Report and Order in Docket No. 19074, 32 FCC 2d 937 (1972) at paras. 12 and 20. In Cherokee Broadcasting Co., 17 FCC 2d 121 at 123, 15 RR 2d 1205 at 1208 (1969), a proceeding involving an applicant for an FM license and a Section 307(b) issue, the Commission stated that "our long-term goal must be the establishment of an integrated AM–FM aural service and we should look to the day when AM and FM stations can be regarded as component parts of a total aural service." See also, Report and Order in Docket No. 15084, 2 RR 2d 1658 (1964), and Babcom Inc., 24 FCC 2d 690, 19 RR 2d 883 (1970) petition for reconsideration denied, 27 FCC 2d 437, 21 RR 2d 6 (1971). Finally, if the Garrett proposal were granted, it would reduce the nighttime coverage in the city of Warner Robins by the WRBN proposal from 92.4% to 81.4% of the population of that city.  .  .  .

The Commission has long held that an applicant proposing to operate in a manner which results in a substantial violation of its technical rules assumes a heavy burden to establish that a grant of its application is in the public interest. Here, there can be no question that (a) the proposal's grossly inadequate coverage of the city of Huntsville is a public interest detriment and results in a grossly inefficient use of this frequency at night; (b) there has been no concomitant showing of sufficient public interest benefits which outweigh this detriment; and (c) such lack of coverage to the city of license is not justified for the purpose of establishing a sixth Huntsville nighttime aural transmission outlet, or a fourth nighttime AM transmission outlet. Nor has the Huntsville applicant established, on the basis of this record, that any portion of its proposed service area is an underserved aural reception radio area.  .  .  .  Under these circumstances, we find the applicant's argument that it is, in effect, penalized here because Huntsville is a large, irregular shaped, city caused by annexations and marked expansion resulting from the phenomenon of enormous urban expansion particularly during recent years, wholly lacking in merit. Moreover, the fact that Huntsville existing stations do not now cover the entire city in no way justifies the addition of a new substandard proposal, and this fact can be accorded no significant weight in our determination of the waiver question here. In sum, we believe Garrett assumed a heavy burden of proof in this case to overcome the gross inadequacy of coverage of Huntsville and, in our view, such burden has not been met.

Leroy Garrett, 38 F.C.C.2d 112, 113, 115 (Rev. Bd.1972) (footnotes omitted).

**7.** Leroy Garrett, 41 F.C.C.2d 617 (1973). Thus the Commission imparted to the Review Board's decision the force and effect of a Commission decision. 47 U.S.C. § 155(d)(3) (1970).

**8.** Pursuant to 47 U.S.C. § 402(b)(1) (1970).

of each standard broadcast station [to] be so located that primary service is delivered to the borough or city, in which the main studio is located in accordance with the [Commission's] rules and regulations. . . ."[9] The Commission also required, as it does now, that as an element of transmitter site "[a] minimum field intensity of 5 to 10 mv/m shall be obtained over the most distant residential section."[10] The administrative law judge found, and the Review Board agreed, that WEUP's projected 5 mv/m nighttime contour would include only 73.4% of Huntsville's total population and 49% of its total area.[11] Neither the judge[12] nor the Board[13] considered WEUP's grounds sufficiently impressive to warrant a waiver of the city coverage requirements.

In this court, the parties have engaged in extensive debate on a number of points and subpoints, some of which we need not consider. For we find that in two broad respects the Review Board[14] erred to the extent that the case must be given further attention administratively on both the coverage and waiver issues. We discuss the difficulties making that necessary[15] and, without intimating a view on any other claim, we remand the case to the Commission for additional proceedings.

## II

During the last quarter-century, Huntsville has experienced a tremendous geographical expansion. From aerospace industry and the resultant annexation of contiguous areas,[16] it had grown nearly 25-fold to 105.6 square miles in 1970.[17]

In the process, the city has become very irregular in shape, stretching to a maximum of about 20 miles from north to south and about 15 miles from east to west.[18] Over the years from 1958, when WEUP commenced operation, its ability to cope with these changing conditions has gradually diminished. Not surprisingly, in 1968 when WEUP sought inauguration of a nighttime service, it was unable to satisfy the coverage rules.

Though conceding this inability, WEUP asserts that the refusal to waive the rules is markedly inconsistent with the Commission's disposition of cognate problems in earlier cases. In Great Southern Broadcasting Company,[19] the Commission dealt with an application for a permit to construct a new AM broadcasting station in Donelson, Tennessee, a small unincorporated community in Davidson County six miles east of Nashville. Nashville and Davidson County had recently merged to become a governmental complex of approximately 625 square miles, within the corporate limits of which were numerous communities, some with assigned radio stations, as well as rural areas. The Commission announced that "[s]ince the new municipality is so large and since it encompasses urban areas, small towns and farmland— all with diverse needs and interests—. . . in allocating stations, [it would] continue to recognize the former town and city limits as they existed prior to the merger."[20]

Even earlier, in KDEF Broadcasting Company,[21] the Commission had adopted much the same approach. An Albuquer-

---

9. 47 C.F.R. § 73.30(c) (1972). This provision was deleted in the process of amendment of the Commission's rules in 1973. 38 Fed.Reg. 5874 (1973). The amendments, however, apply only to applications filed after April 10, 1973, the date upon which they went into effect. *Id.*

10. 47 C.F.R. § 73.188(b)(2) (1973).

11. Leroy Garrett, *supra* note 4, 38 F.C.C.2d at 120 (initial decision).

12. *Id.* at 124–125.

13. Leroy Garrett, *supra* note 6, 38 F.C.C.2d at 113, 115 (Rev.Bd.), quoted *supra* note 6.

14. See note 7, *supra.*

15. Parts II, III, *infra.*

16. *See* Leroy Garrett, *supra* note 7, 41 F.C. C.2d at 619 (Comm'n) (dissenting statement).

17. *See* Leroy Garrett, *supra* note 4, 38 F.C. C.2d at 120 (initial decision).

18. *Id.*

19. 7 F.C.C.2d 860 (1967).

20. *Id.* *See also* Central Broadcasting Co., 11 F.C.C.2d 701, 702 n. 4 (1968).

21. 30 F.C.C. 635 (1961).

que, New Mexico, station broadcasting daytime-only was authorized to do so unlimitedly despite nonconformity with the 5 mv/m minimum field intensity rule. The station's 5 mv/m coverage extended to only 67.8% of the area within the city limits of Albuquerque, though to 90.6% of its population, because large unserved areas within these boundaries were underpopulated. The Commission, concluding that waiver of the rule was called for, declared that "[i]t would be unduly harsh to require an applicant to render 'principal city' service to vacant acreage merely because the city—even though with an eye toward future development—has laid out its boundaries so as to encompass such acreage." [22]

■ Hitherto, we have had occasion to deal with claims of disparate decisional treatment accorded parties by administrative bodies. Speaking of one agency, we have twice said that it "cannot act arbitrarily nor can it treat similar situations in dissimilar ways," [23] and we remanded litigation to the agency when it did not take pains to reconcile an apparent difference in the treatment accorded litigants circumstanced alike. [24] We have pursued the same course with respect to the agency now before us where "the differences [were] not so 'obvious' as to remove the need for explanation." [25] These rulings vividly reflect the underlying principle that agency action cannot stand when it is "so inconsistent with its precedents as to constitute arbitrary treatment amounting to an abuse of discretion." [26]

■ The Commission's counsel argue that there was no deviation from precedent in the case at bar, and they endeavor to distinguish the earlier decisions to which we have adverted. It is clear, however, not only that "[m]ore than enumeration of factual differences between cases is required," but also that "the Commission must explain their relevance to the purposes of the" legislation it administers. [27] Only recently we admonished that "[t]he premises upon which the validity of an administrative order is to be decided are only those upon which the agency predicated its action," [28] for "[i]t is 'a simple but fundamental rule of administrative law . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must adjudge the propriety of such action solely by the grounds invoked by the agency.' " [29]

■ Here the Review Board did not attempt to reconcile its disposition of WEUP's application with past decisional practice; although the problem was evi-

**22.**  *Id.* at 636 (footnote omitted).

**23.**  Herbert Harvey, Inc. v. NLRB, 137 U.S.App. D.C. 282, 292, 424 F.2d 770, 780 (1969); Burinskas v. NLRB, 123 U.S.App.D.C. 143, 148, 357 F.2d 822, 827 (1966). *See also* Columbia Broadcasting Sys., Inc. v. FCC, 147 U.S.App. D.C. 175, 183, 454 F.2d 1018, 1026 (1971); Indiana Broadcasting Corp. v. FCC, 132 U.S. App.D.C. 218, 221–223, 407 F.2d 681, 684–685 (1968); Herbert Harvey, Inc. v. NLRB, 128 U.S.App.D.C. 162, 164–165, 385 F.2d 684, 686–687 (1967) (concurring opinion); NLRB v. Campbell Soup Co., 378 F.2d 259, 262 n.4 (9th Cir.), cert. denied, 389 U.S. 900, 88 S.Ct. 218, 19 L.Ed.2d 217 (1967); cases cited note 26, *infra*.

**24.**  Herbert Harvey, Inc. v. NLRB, *supra* note 23, 128 U.S.App.D.C. at 164, 385 F.2d at 686; Burinskas v. NLRB, *supra* note 23, 123 U.S. App.D.C. at 148, 357 F.2d at 827.

**25.**  Melody Music, Inc. v. FCC, 120 U.S.App. D.C. 241, 243–244, 345 F.2d 730, 732–733 (1965).

**26.**  Herbert Harvey, Inc. v. NLRB, *supra* note 23, 137 U.S.App.D.C. at 292, 424 F.2d at 780. *See* NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 442, 85 S.Ct. 1061, 1063–1064, 13 L.Ed.2d 951, 954–955 (1965); Secretary of Agriculture v. United States, 347 U.S. 645, 653–654, 74 S.Ct. 826, 831–832, 98 L.Ed. 1015, 1023–1024 (1954); Local 814 v. NLRB, 167 U.S.App.D.C. 387, 512 F.2d 564, 567 (1975).

**27.**  Burinskas v. NLRB, *supra* note 23, 123 U.S. App.D.C. at 148 n. 5, 357 F.2d at 827 n. 5.

**28.**  Tygrett v. Washington, No. 72–1876 (D.C. Cir. Oct. 23, 1974), at 13. See also the cases there cited.

**29.**  *Id.*, quoting SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947).

dent, the Board did not address it at all.[30] We cannot accept rationalizations offered by counsel as an adequate substitute for a response due the Commission itself. It is neither for counsel nor for us, but for the Commission itself, to explain any distinguishing characteristics it finds appealing, and to do so on a basis demonstrative of their pertinence to its statutory responsibilities.

### III

WEUP'S licensee, Garrett Broadcasting Service, is solely owned by appellant Leroy Garrett, who is black. The record indicates that, at least when the case was before the Commission, WEUP's staff with minor exceptions was also black. WEUP was and is one of the infinitesimal number of black-owned and -operated broadcasting stations to be found anywhere in the United States.[31]

Beyond that, 16,729 of Huntsville's total population of 137,802 are black citizens, to whom WEUP can and does cater in its programing.[32] WEUP claims that its proposed nighttime service area would have embraced 111,812, of whom 15,394 are black, that it would also have brought primary AM service to 53,296, including 4,494 blacks, who receive such service from but one AM station, and to an additional 12,689, including 1,525 blacks, who have no AM service at all.[33]

At the administrative level, WEUP urged that its black ownership and black operation was a factor deserving careful attention. The administrative law judge did not even allude to that factor in his initial decision, and the Review Board dismissed it as "without decisional significance." [34] Though advertent to WEUP's claim that its nighttime proposal would provide service to the vast majority of Huntsville black inhabitants,[35] the Board noted that it had "reviewed applicable precedent and" believed that "such precedent precludes a waiver under all the present circumstances." [36] Without

---

**30.** As we have stated, the Commission refused to review the decision of the Review Board, see text *supra* at note 7, although Commissioner Hooks, in dissent, espoused the view that WEUP's application should have been considered in light of *Great Southern*, see text *supra* at notes 19–20. Leroy Garrett, *supra* note 7, 41 F.C.C.2d at 618–619 (Comm'n) (dissenting statement).

**31.** "In 1973, there were over 7,000 radio stations and 1,000 television stations operating in the United States. Of these, only 33 radio stations located in 20 States and the District of Columbia and no televisions stations were owned by minority group members." U. S. Comm'n on Civil Rights, the Federal Civil Rights Enforcement Effort—1974, vol. I at 49 (1974) (footnote omitted).

**32.** Leroy Garrett, *supra* note 4, 38 F.C.C.2d at 17 (initial decision.)

**33.** These data were presented to the Commission. There are no findings with reference to them.

**34.** Leroy Garrett, *supra* note 6, 38 F.C.C.2d at 116 app. (Rev.Bd.).

**35.** *Id.* at 113.

**36.** More fully, the Board said:
   The second question relates to Garrett's claim that (a) 85% of the blacks in the city will be served by his operation; and (b)

there is presently "widespread dissatisfaction" with black oriented radio. The Board has reviewed the applicable precedent and, in our view, such precedent precludes a waiver under all the present circumstances. Initially, it is to be noted that the record in this proceeding is practically totally barren of any showing of the claimed "dissatisfaction" and that nowhere has Garrett indicated any specifics of what is wrong with existing programming or *what he would do to improve the situation if his request for a change in facilities were granted.* In addition, this record is barren of evidence that the black population of Huntsville do not have FM receivers and, hence, are underserved from that standpoint. Moreover, the Commission has recently had occasion to consider similar arguments in cases involving questions of waiver of other technical rules. In Mel-Lin, Inc., 22 FCC 2d 165, 18 RR 2d 787 (1970), the Commission, after agreeing with the Review Board that the applicant had "made commendable efforts to ascertain and propose programs designed to serve the needs of . . . [the minority population] on a continuing basis . . . ," reversed the Review Board's grant of the application. The Commission suggested that "representatives of concerned organizations might properly contact the existing fulltime stations . . . to see if greater efforts can be made to establish more meaningful communications with the [black] audience."

assigning any weight to the black-ownership black-operation factor,[37] the Board declared that WEUP had "assumed a heavy burden in this case to overcome the gross inadequacy of coverage of Huntsville and" that "such burden has not been met." [38]

■ In this analysis and appraisal of WEUP's contention, the Review Board was grievously incorrect. In our recent *TV 9* decision [39] we addressed a situation wherein the Commission had refused to accord merit [40] to a contestant for a television channel by reason of the inclusion of two black stockholders in its venture. The Review Board had held, and the Commission had agreed, that "[u]nless [the applicant] showed that the participation of [blacks] in the operation of the station would use their experience, background and knowledge of the community in a way likely to result in a superior service it cannot prevail on this point"; [41] and that "[t]here is nothing in the degree or type of participation proposed . . . which gives assurance that the benefits of their racial background will inure in any material degree to the operation of the station." [42] The Board had further expressed the belief "that, in a comparative broadcast proceeding, . . . Black ownership cannot and should not be an independent comparative factor," [43] but "rather . . . must be shown on the record to result in some public interest benefit," [44] and "is decisionally significant only when reflected in active participation in station affairs." [45]

We rejected these arguments; we stated:

[M]inority stock ownership of an applicant serving [] community is a consideration relevant to a choice among applicants of broader community representation and practicable service to the public. The credit awarded due to . . . participation, as a part own-

In a later case, Champaign National Bank, 22 FCC 2d 790 at 792, 18 RR 2d 1170 at 1174 (1970), the Commission, after denying a request for waiver of Section 73.24(b)(3) of the Rules, stated that "[a]ttempts to cure programming deficiencies by distorting or ignoring sound allocation and station assignment principles would constitute acts of expediency running counter to our statutory mandate to make the most effective use of the crowded AM band on a national basis." See also, 1360 Broadcasting Co., Inc., 36 FCC 1478, 2 RR 2d 824 (1964), where a request for waiver of the 10% rule based upon the special needs of the black audience was denied, and a similar holding in Grantell Broadcasting Co., 23 FCC 2d 74, 18 RR 2d 1063 (1970).

*Id.* at 113–115 (emphasis supplied).

**37.** See *id.* at 114, 115, quoted *supra* notes 6, 36.

**38.** *Id.* at 115, quoted *supra* note 6.

**39.** 161 U.S.App.D.C. 349, 495 F.2d 929 (1973), cert. denied, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974). It will be noted that *TV 9* was decided after the administrative decisions in the instant litigation.

**40.** In our supplemental opinion in *TV 9*, 161 U.S.App.D.C. at 361, 495 F.2d at 941, we distinguished our use of "merit" from "preference." We explained that we there used the latter term "to mean a decision by the Commission that the qualifications of a particular

applicant in a comparative hearing are superior to those of another applicant with respect to one or more of the issues upon which the grant of a permit or license turns." *Id.* n. 2, 495 F.2d at 941 n. 2. " 'Merit' or 'favorable consideration,' " we said, "is a recognition by the Commission that a particular applicant has demonstrated certain positive qualities which may but do not necessarily result in a preference. 'Merit,' therefore, is not a 'preference' but a plus-factor weighed along with all other relevant factors in determining which applicant is to be awarded the preference." *Id.*

**41.** *Id.* at 356, 495 F.2d at 936, quoting Mid-Florida Television Corp., 33 F.C.C.2d 34, 268 (1970) (initial decision).

**42.** TV 9, Inc. v. FCC, *supra* note 39, 161 U.S. App.D.C. at 356, 495 F.2d at 936, quoting Mid-Florida Television Corp., *supra* note 41, 33 F.C.C.2d at 268 (initial decision).

**43.** TV 9, Inc. v. FCC, *supra* note 39, 161 U.S. App.D.C. at 356, 495 F.2d at 936, quoting Mid-Florida Television Corp., 33 F.C.C.2d 1, 17–18 (Rev.Bd.1972).

**44.** TV 9, Inc. v. FCC, *supra* note 39, 161 U:S. App.D.C. at 356, 495 F.2d at 936, quoting Mid-Florida Television Corp., *supra* note 43, 33 F.C.C.2d at 17–18.

**45.** TV 9, Inc. v̇. FCC, *supra* note 39, 161 U.S. App.D.C. at 356, 495 F.2d at 936, quoting Mid-Florida Television Corp., *supra* note 43, 33 F.C.C.2d at 17–18.

er, in management is not the same as credit based on broader community representation attributed to [black] ownership and participation.[46]

Consequently, we held "that when minority ownership is likely to increase diversity of content, especially of opinion and viewpoint, merit should be awarded,"[47] and that "[r]easonable expectation, not advance demonstration, is a basis for merit to be accorded relevant factors."[48]

██ It is evident that the Review Board's treatment of WEUP's blackness cannot be harmonized with the principles articulated in *TV 9*. The Board gave that factor no weight whatsoever because WEUP did not undertake to demonstrate independently that its black-oriented programming would surpass that of older area stations.[49] The entire thrust of *TV 9* is that black ownership and participation together are themselves likely to bring about programming that is responsive to the needs of the black citizenry,[50] and that that "reasonable expectation," without "advance demonstration," gives them relevance.[51] We think it clear that WEUP's long and solid identification with black listeners in Huntsville gained pertinence when the effort to enlarge its audience was made.[52]

In sum, it is incumbent upon the Commission to reevaluate its determination on applicability of its coverage rule in light of its past precedents,[53] and, if necessary, its conclusion on waiver in light of *TV 9*.[54] To these ends, we remand this case to the Commission for further proceedings in conformity with this opinion.

So ordered.

---

**46.** TV 9, Inc. v. FCC, *supra* note 39, 161 U.S.App.D.C. at 357, 495 F.2d at 937. In our supplemental opinion, we explained that we had "not relied solely upon minority ownership," but had held "only that [the applicant] was entitled to be accorded merit due to the ownership and participation of" its two black stockholders. *Id.* at 361, 495 F.2d at 941. We stated further that "[w]hat consideration might be given to ownership of stock alone is not before the court. Nor need we consider whether the primary reliance is properly assigned to ownership or participation, for in this case there is a meaningful combination." *Id.* at 361 n. 1, 495 F.2d at 941 n. 1.

**47.** *Id.* at 358, 495 F.2d at 938.

**48.** *Id. See also* Citizens Communications Center v. FCC, 145 U.S.App.D.C. 32, 44 n. 36, 447 F.2d 1201, 1213 n. 36 (1971), 149 U.S.App.D.C. 419, 420, 463 F.2d 822, 823 (1972).

**49.** Leroy Garrett, *supra* note 6, 38 F.C.C.2d at 114 (Rev.Bd.), quoted *supra* note 36.

**50.** *See* TV 9, Inc. v. FCC, *supra* note 39, 161 U.S.App.D.C. at 357–358, 361–362, 495 F.2d at 937–938, 941–942.

**51.** *Id.* at 358, 495 F.2d at 938, quoted in text *supra* at note 48.

**52.** We are mindful that the issue in *TV 9* arose in a contest for a station license while the context here is allocation of the AM band, but that in our view summons no difference in principle. The ultimate concern in each instance is the public interest, see, *e. g.,* 47 U.S.C. §§ 307(a), (d), 309(a), 316(a) (1970); TV 9, Inc. v. FCC, *supra* note 39, 161 U.S.App.D.C. at 356–357, 361–362, 495 F.2d at 936–937, 941–942, and the question in both instances is the degree to which it may be promoted by black ownership and participation in a broadcasting operation.

**53.** See Part II, *supra*.

**54.** See this Part III, *supra*.