NATIONAL ALLIANCE OF POSTAL
AND FEDERAL EMPLOYEES,
Plaintiff,

v.

Herman NICKERSON, Jr., Defendant.

Civ. A. No. 74–688.

United States District Court,
District of Columbia.

Nov. 22, 1976.

Fred W. Drogula and Jacob Dweck, Ginsburg, Feldman & Bress, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Joseph Guerreri, Peter R. Reilly, Asst. U. S. Attys., Washington, D. C., for defendant.

## MEMORANDUM OPINION

WADDY, District Judge.

### I. The Factual Background

This action arises under the Federal Credit Union Act of 1934, as amended, 12 U.S.C. § 1751, *et seq.* Plaintiff seeks a declaration that defendant's action in denying its application for a federal credit union charter for its membership was arbitrary, capricious and discriminatory, and in excess of, and contrary to the provisions of the Federal Credit Union Act, more specifically Sections 1754 and 1759 thereof, and the regulations issued thereunder. Plaintiff further seeks injunctive relief and asks the Court to order defendant to grant its application. The case is now before the Court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment.

Plaintiff, National Alliance of Postal and Federal Employees (National Alliance), is a national labor organization with a membership of approximately 40,000, the vast majority of which are black postal employees.

Defendant is the Administrator of the National Credit Union Administration (NCUA), an independent agency in the Executive Branch of the United States Government.

The provisions of the Federal Credit Union Act applicable to the issues raised herein provide in pertinent part:

> "The organization certificate shall be presented to the Administrator for approval. Before any organization certificate is approved, an appropriate investigation shall be made for the purpose of determining (1) whether the organization certificate conforms to the provisions of this chapter; (2) the general character and fitness of the subscribers thereto; and (3) the economic advisability of establishing the proposed Federal credit union. . . ." 12 U.S.C. § 1754.

> "Federal credit union membership shall consist of the incorporators and such other persons and incorporated and unincorporated organizations, to the extent permitted by rules and regulations prescribed by the Administrator . . . except that Federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well defined neighborhood, community, or rural district." 12 U.S.C. § 1759.

In 1971 National Alliance applied to NCUA for a Federal credit union charter to serve its membership on a national basis. The application was referred to an investigator who made a report (Federal Credit Union Investigation Report) and recommended that a charter be granted to the group. The report contained, *inter alia,* the following information:

(1) National Alliance applied as a group having an associational common bond;

(2) The proposed field of membership was defined as "Regular and Associate members of the National Alliance of Postal and Federal Employees . . .",

(3) There were no factions within the group which may render smooth and efficient credit union operations difficult;

(4) The number of potential members of the proposed National Alliance Credit Union was 37,881;

(5) Organization on an employee basis was not considered because the membership is widely disbursed with many members located in isolated places where it would not be practical to organize a credit union;

(6) 1,500 members had signified their intention of joining and supporting the credit union; and

(7) Space in union publications, a secure office area, clerical assistance, and payroll deductions would be provided by National Alliance.[1]

In an internal memorandum transmitting that report to the Assistant Regional Director of NCUA the investigator referred to the charter meeting of the applicant group, stating that "[a]ll of the persons attending the meeting appear to be highly qualified and all are long-time members of National Alliance."[2] The Acting Regional Director, however, did not recommend the charter to the Administrator because approximately 98 percent of the membership were postal service employees, resulting in a 100 percent overlap with the U. S. Postal Service Federal Credit Union, Charter Number 16402, which serves all postal employees not having credit union service available on a local basis.[3] The Administrator concluded that National Alliance did not qualify for a charter because of this overlap, and because association of members was on a local basis, there being no provisions in the union's constitution or bylaws for association on a national basis through regular annual meetings.[4] By letter dated March 31, 1972, which incorporated the substance of the Administrator's conclusions, National Alliance was advised by the Regional Director that its application was denied.

Plaintiff appealed to the Administrator to reverse the denial pointing to the numerous and continuous contacts among the members of National Alliance, the objectives shared by the membership, and the fact that the National Association of Postmasters of the United States as well as other associations similarly situated to National Alliance had been granted charters by the NCUA. In connection with this review, comments from various divisions and persons within NCUA were solicited. By letter dated June 5, 1972, the denial was affirmed, the Administrator finding there existed no common bond of association, and that the granting of the charter would create overlapping availability of credit union service, contrary to chartering policy set forth in its manual "Organizing a Federal Credit Union", which contained the standards and guidelines relating thereto.[5] Under the circumstances herein, the latter rationale is essentially a denial based on economic advisability.

Plaintiff continued with its appeal efforts through February 8, 1974, when it was informed that NCUA policy had not changed since March 31, 1972, the date of the original rejection. During this period defendant made repeated suggestions that plaintiff apply for separate charters based on its local or district organizational levels.

■ The discretionary power vested in the Administrator by 12 U.S.C. § 1754 has not heretofore been challenged. The Court is persuaded by defendant's contention that the power of NCUA is analogous to that granted to the Federal Home Loan Bank Board by 12 U.S.C. § 1464(a) and (e), and to the Comptroller of the Currency by 12 U.S.C. §§ 26 and 27. It is well established that vast discretion has been conferred upon these similar regulatory agencies and that judicial review of discretionary action is necessarily limited. *See, Federal Home Loan Bank Board v. Rowe*, 109 U.S.App.

1. Administrative Record, Encl. 9a, at 1–3.

2. *Id.*, Encl. 9.

3. *Id.*, Encl. 11, at 2.

4. *Id.*, Encl. 12, at 1.

5. The "Organizing a Federal Credit Union" manual (hereinafter Organization Manual) is incorporated by reference into NCUA rules and regulations. 12 C.F.R. § 701.2(d)(6)(1976).

D.C. 140, 284 F.2d 274, 277–278 (1960); *Sterling National Bank of Davie v. Camp*, 431 F.2d 514, 516 (5th Cir. 1970). Accordingly, plaintiff must carry the burden of proving that the Administrator's denial of its application for a Federal credit union charter was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[6]

In reviewing the Administrator's denial of the National Alliance application, the Court is confined to the administrative record and such additional explanation of those factors considered as may be necessary to determine if the Administrator's action was unwarranted by the facts. *See, Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## II. The Common Bond Issue

Defendant does not question the fact that a common bond exists among plaintiff's membership. Defendant does contend, however, that the Administrator correctly determined that the extent and nature of association was insufficient for issuance of a charter. Plaintiff challenges this conclusion, urging that National Alliance does meet the definition, meaning and purpose of associational common bond. Plaintiff asserts that the Administrator's decision was improperly based on a finding that there was no extensive commingling among National Alliance members on a national scale because only a biennial, rather than an annual, convention with an attendance of approximately 1200 members is held by the union.

Common bond, as it applies to Federal credit union chartering, is defined and explained in the Organization Manual at page 3 as follows:

"Common bond is a characteristic prerequisite to the fulfillment of group objec-

tives and when present among persons of related interests and purposes, these persons could be expected to effectively operate a credit union."

Associational common bond is further defined as:

"_ _ _ association resulting from membership in an organization, participation in whose activities develops common loyalties and mutual interests." *Id.*

With respect to applications of associational groups for Federal credit union charters, the Organization Manual further states at pages 10–11:

"In deciding whether a Federal credit union charter may be issued to an associational group, the extent and nature of association derived from membership should be carefully considered. The effect of common loyalties and mutual interest resulting through participation in organization activities should also be considered.

\*     \*     \*     \*     \*     \*

"The common bond is usually stronger when an association is firmly established.

·   ·   ·   ·

\*     \*     \*     \*     \*     \*

"The association should hold regular membership meetings or it should sponsor other activities which provide for commingling of members and strengthen the bond among them."

Labor unions are specifically listed in the Organization Manual as among those associational groups eligible for a charter.[7] The list of organizational groups which have been granted charters is lengthy and varied. Included are groups such as the National Association of Postmasters, the National Medical Association, the Air Line Pilots Association, the United Mine Workers of America, and the International Arabian Horse Association, whose charters are na-

---

6. 5 U.S.C. § 706(2)(A).

7. The Organization Manual emphasizes at page 10 that there is a NCUA policy requiring labor union groups to be chartered on an occupation-

al basis unless substantial numbers of the membership cannot be reached by such groups. The National Alliance application was classified as associational.

tional in scope. Only a curt explanation was offered by the Administrator as to how National Alliance differed from these, and other chartered associational groups.

As plaintiff points out, the provisions formerly included in definitional statements requiring that members associate together, be extensively acquainted with other members or that they know each other, have been stricken from the current, more liberal standards. Moreover, the current Organization Manual clearly envisions a broad variety of associational activities that can provide the commingling of members, thereby strengthening the bond among them. The suggestion that an annual national gathering should be a requirement is simply not supported.

The Organization Manual does not specifically address national charters. However, it does infer a policy against them.[8] Notwithstanding such a policy, defendant concedes, as it must, that associational groups have been granted nation-wide charters. Defendant views these national charters as exceptions to NCUA policy; plaintiff asserts the granting of such charters to similarly situated organizations is NCUA precedent.

The common bond of association existing among the National Alliance membership grows out of the union's organizational structure as well as the common objectives of improving wages, hours and working conditions. The National Alliance common bond is as strong, if not stronger than the common bond existing among other associations already enjoying a national charter. Continued reliance on a policy against national charters, particularly in light of the existing United Mine Workers' and the National Postmasters' charters, is incongruous. And although the circumstances behind these, and other national charters may be technically distinguishable, their existence

supports a finding that whatever policy NCUA had against the granting of national charters when National Alliance was seeking a charter, was either changed, or was not adhered to.

■ The Court therefore concludes that there was no justification for the disparate treatment of National Alliance, and that the Administrator's action in denying National Alliance a Federal credit union charter for these reasons was arbitrary, capricious and an abuse of discretion. *Herbert Harvey, Inc. v. N. L. R. B.,* 137 U.S.App. D.C. 282, 424 F.2d 770 (1969); *HC&D Moving & Storage Company v. United States,* 298 F.Supp. 746 (D. Hawaii 1969); *Garrett v. F. C. C.,* 168 U.S.App.D.C. 266, 513 F.2d 1056 (1975).

### III. *The Economic Advisability Issue*

The Organization Manual defines and explains the meaning of the economic advisability requirement at page 3 as follows:

"Determination of the economic advisability of establishing a proposed Federal credit union is based on the number of potential members, evidence of group interest, leadership, willingness of persons to serve and participate, and the general characteristics of the sponsor or factors or conditions present in the area."

Additionally, the Organization Manual, at page 22, explains that in order to provide a complete picture of the group planning to organize a Federal credit union, the Investigation Reports contain, *inter alia,* the following information relating to economic advisability:

"a. The size and compactness of the group;

b. The nature of the common bond;

c. The attitude of

\*   \*   \*   \*   \*   \*

8. That inference is now supported by Attachment D, NCUA Instruction 6000.1, July 25, 1974, subj. Chartering Policies, at 4, and Attachment E, Guidelines for Chartering an FCU on a National Associational Level, January 31, 1974, attached to Defendant's Supplemental Memorandum of Points and Authorities in Op-

position to Plaintiff's Motion to Compel Discovery and to Further Enlarge its Time to Respond to Defendant's Motion for Summary Judgment. However, neither of these guidelines was in existence when National Alliance originally applied for its charter.

(2) officers in associational groups,

\*   \*   \*   \*   \*   \*

d. The facilities available for credit union operation;
e. The availability of existing credit union service; and
f. Other facts to support a potential for successful operation."

In denying the National Alliance application, the Administrator relied upon a "consistent theme" running throughout the NCUA chartering policy that "overlapping fields of credit union membership will be avoided."[9] Defendant argues that virtually all of plaintiff's members already have a variety of existing credit unions available to provide services to them, and that the likelihood of a new credit union's success is therefore diminished.

Plaintiff points out that it meets each of the factors identified in the Organization Manual as relevant to the economic advisability requirement,[10] and that denial solely on the basis of existing credit union service was arbitrary, particularly since there was no factual investigation concerning economic advisability or actual availability of non-discriminatory credit union service.

Defendant's position is that there is an NCUA policy against overlapping fields of credit union membership and that the U. S. Postal Service Federal Credit Union is already available to serve all postal employees, including plaintiff's members. Plaintiff concedes that granting its application for a national charter would create an overlap.

Plaintiff's members represent about five percent of the total postal workforce.[11] Thus, while nearly all of National Alliance's members would theoretically have two Federal credit unions available to serve them the effect on the stability of the U. S. Postal Service Credit Union would seemingly be minimal.

Moreover, defendant has indicated a willingness to organize Federal credit unions on plaintiff's local or district organizational levels. The Court finds this position inconsistent inasmuch as the granting of such local or district level charters would in no way reduce the overlap situation. Furthermore, overlap situations exist elsewhere in the postal service, the most analogous being the overlap between the U. S. Postal Service Federal Credit Union and the National Postmasters Association Federal Credit Union.

Finally, the record herein fails to reveal any in-depth analysis or investigation with respect to the probable success of a National Alliance Federal credit union on a nationwide basis. The assessment of the economic advisability of such a credit union is found in the following statement by the Deputy Administrator:

"I would venture a *guess* that if this FCU was organized—it would not be successful in serving its members—and might well be a casualty within five years."[12]

Under the circumstances presented herein, and plaintiff having met all other economic advisability standards, the Administrator's determination that a National Alliance charter was not economically advisable, and his reliance on overlapping fields of available credit union services was contrary to the National Credit Union Act, and NCUA's own regulations and precedent, and was arbitrary, capricious and an abuse of discretion. *Columbia Broadcasting System, Inc. v. F. C. C.,* 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971); *Garrett v. F. C. C., supra.*

### IV. Conclusion

Based upon the foregoing, the Court concludes that the Administrator's findings and its refusal to grant plaintiff, National Alliance, a Federal credit union charter were not in accordance with the Federal

---

9. Record, *supra,* Encl. 19, at 1–2.

10. *See* Investigation Report findings, *supra,* at 2–3.

11. Record, *supra,* Encl. 15, at 5.

12. *Id.,* Encl. 18, at 3. Emphasis added.

Credit Union Act, NCUA's own regulations and precedent, and were arbitrary, capricious and an abuse of discretion. There being no genuine issue as to any material fact, plaintiff is entitled to judgment as a matter of law. Defendant's motion for summary judgment will be denied, and plaintiff's cross-motion will be granted. Defendant will be ordered and directed to re-evaluate plaintiff's application and determine plaintiff's eligibility for a Federal credit union charter on a national associational level in light of this Court's ruling.