CHEM–HAULERS, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 76–1488.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1977.

Decided Sept. 19, 1977.

As Amended Dec. 16, 1977.

Maxwell A. Howell, Washington, D. C.,
for petitioner.

Kenneth P. Kolson, Atty., I.C.C. Vienna,
Va., for respondents. Mark L. Evans, Gen.
Counsel, I.C.C., Charles H. White, Jr., Asso-
ciate Gen. Counsel, I.C.C., Mary C. Swann,
Atty., I.C.C., and Lloyd John Osborn, Atty.,
Dept. of Justice, Washington, D. C., were
on the brief for respondents.

Before BAZELON, Chief Judge, and
LEVENTHAL and ROBINSON, Circuit
Judges.

Opinion for the Court filed by Circuit
Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Cir-
cuit Judge:

Petitioner, Chem-Haulers, Inc., operates
as a common carrier under a number of
certificates of public convenience and neces-
sity, issued by respondent Interstate Com-
merce Commission, which license the trans-
portation of specified commodities between

designated points or areas. In times past, by a process known as "tacking," carriers like petitioner often combined the authority conferred by two certificates relating to the same commodity and sharing a common terminus in order to haul freight between the non-common termini of the respective certificates by way of the common point—the "gateway"—even though its movement directly between the non-common points was not specifically franchised.[1] The Commission tolerated this practice[2] until 1974, when it adopted rules[3] designed to outlaw unsanctioned tacking, and to substitute therefor direct operating authority if, but only if, consistent with the public interest.[4]

To determine whether in particular instances an award of direct authority should accompany the consequent elimination of a gateway, the Commission incorporated, insofar as is pertinent here,[5] the standard it had enunciated earlier in *Childress—Elimination of Sanford Gateway:*[6] the applicant must prove that he "is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers," provided, however, that the grant of direct authority would not "enable [the] applicant to institute a new service or a service so different from that presently provided as to materially improve [the] applicant's competitive position to the detriment of existing carriers."[7] The only substantial question before us[8] is whether the Commission properly

---

1. That is, if the carrier held authority from A to B, and as well from B to C, it could operate from A to C via B. *Cf. Alexander v. ICC,* 185 U.S.App.D.C. ——, —— – ——, 567 F.2d 91, 92–93 (1977).

2. See *Thompson Van Lines, Inc. v. United States,* 399 F.Supp. 1131, 1134–1136 (D.D.C. 1975), *aff'd,* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976), and cases cited therein.

3. 49 C.F.R. § 1065 (1975), adopted in *Motor Common Carriers of Property, Routes and Service,* 116 M.C.C. 530 (1974), and upheld in *Thompson Van Lines, Inc. v. United States, supra* note 2, and *Common Carrier Conference—Irregular Route v. United States,* 175 U.S.App.D.C. 244, 534 F.2d 981, *cert. denied,* 429 U.S. 921, 97 S.Ct. 317, 50 L.Ed.2d 288 (1976).

4. 49 C.F.R. § 1065.1(b) (1975) provides that except where "the most direct highway distance between the points to be served is not less than 80 percent of the highway distance between such points" via the gateway—as noted in 49 C.F.R. § 1065.1(a) (1975)—or where the entire journey covers 300 miles or less or where tacking is specifically permitted, compare *Russell Transfer, Inc. v. United States,* 547 F.2d 231, 235 (4th Cir. 1976); *Thompson Van Lines, Inc. v. United States, supra* note 2, 399 F.Supp. at 1135, common carriers are prohibited from tacking unless they obtain "direct service operating authority" for the route formerly tacked. To apply for direct service authority, a carrier was required to submit within 60 days after the effective date of the regulations, an "OP–OR–9" application, accompanied by an appropriate tariff and a verified statement incorporating "all of the evidence applicant plans to present," 49 C.F.R. § 1065.2 (1975). See also General Policy Statement, Gateway Elimination Applications, 41 Fed.Reg. 2459 (1976); *Frozen Food Express, Inc. v. United States,* 535 F.2d 877, 879 (5th Cir. 1976); *Squaw Transit Co. v. United States,* 402 F.Supp. 1278, 1282 (N.D. Okl.1975). See also note 5 *infra.*

5. Carriers desiring to continue through service satisfying the "80-percent rule" prescribed by 49 C.F.R. § 1065.1(a) (1975), see note 4 *supra,* were also required to adopt a more direct route than that through the gateway, 49 C.F.R. § 1065.1(d)(1) (1975), and for them the Commission provided a simple "letter-notice" procedure to eliminate the necessity of travel through the gateway. *Id.* Over 24,000 letter-notices were eventually filed. *Squaw Transit Co. v. United States, supra* note 4, 402 F.Supp. at 1282. This provision is not implicated in the case *sub judice.*

6. 61 M.C.C. 421, 428 (1952), relied upon in *Motor Common Carriers of Property, Routes and Service, supra* note 3, 116 M.C.C. at 536. The *Childress* doctrine had originally been employed to determine whether a carrier could substitute direct authority for existing lawful tacking.

7. *Childress—Elimination of Sanford Gateway, supra* note 6, 61 M.C.C. at 428, quoted in *Motor Common Carriers of Property, Routes and Service, supra* note 3, 116 M.C.C. at 536.

8. Petitioner does assert that the Commission admitted a protest in contravention of its own rules, but in our view of the case no appreciable prejudice could have flowed from this event even if it were erroneous. We therefore do not address the substance of this claim.

applied that standard to petitioner.[9]

A gateway elimination application by petitioner sought thirteen separate awards of direct authority.[10] Ten of petitioner's supplications were supported only by descriptions of the gateway routes to be abolished, and by the verified statements of its traffic manager that the firm had unsuccessfully solicited but would have transported any shipments over them.[11] The Commission denied these requests in their entirety, and petitioner does not challenge their disposition as inconsistent with the *Childress* doctrine. Instead, it claims that barely a handful of the almost 600 applications of this sort [12] previously handled by the Commission pursuant to its gateway elimination rules were granted though equally bereft of substance, and urges that the Commission be made to explain this allegedly inconsistent treatment.[13]

If it were clear that the instances cited were simply inadvertent departures from a generally uniform course of decision, we would deplore them without permitting them to derange the outcome of other cases. The mere fact that the Commission may have nodded on one occasion does not entitle a litigant to a repetition of its blunder.[14] And Commission counsel represented at oral argument that the administrative records in these allegedly maverick cases contained evidence of traffic through the gateways involved, even though that evidence was not mirrored in the applications.[15] Still, we have before us neither the Commission's statement that it earlier strayed nor the records adverted to, and we cannot rest on its counsel's unadorned assertion.[16] We think it would comport with sound administration to have the Commis-

---

**9.** *Chem-Haulers, Inc., Extension—Gateway Elimination,* Docket No. MC–116254 (Sub. No. 144G), (Rev. Bd. No. 2 Aug. 25, 1975) (unreported), *modified and aff'd,* (Div. 1 acting as an appellate division, Dec. 9, 1975) (unreported), *reconsideration denied* (Mar. 26, 1976) (unreported).

**10.** See Notice, MC–116254 (Sub. No. 144G), 40 Fed.Reg. 23,962 (1975).

**11.** Verified statement of Douglas O. Logue, App.Doc. No. 1.

**12.** According to representations made by the Commission to the court in *Squaw Transit Co. v. United States, supra* note 4, 402 F.Supp. at 1282, it received 579 OP–OR–9 applications for direct authority. Petitioner calls our attention to three cases in which direct authority was granted pursuant to the Commission's gateway elimination procedures even though the traffic exhibits showed no carriage along the routes allegedly tacked. It also points to one case in which no traffic exhibit was filed at all. Brief for Petitioner at 17–18. It is worth noting, though we need not rely on it, that Commission counsel represented at oral argument before us that these applications each contained at least some evidence of traffic through the gateways in question, albeit that evidence was not to be found in the traffic tabulations themselves.

**13.** Petitioner thus seeks to bring this case within the rationale of such precedents as *Garrett v. FCC,* 168 U.S.App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975), quoting *Herbert Harvey, Inc. v. NLRB,* 137 U.S.App.D.C. 282, 292, 424 F.2d 770, 780 (1969) (footnotes omitted):

[An agency] 'cannot act arbitrarily nor can it treat similar situations in dissimilar ways,' [ ] and we [have] remanded litigation to the agency when it did not take pains to reconcile an apparent difference in the treatment accorded litigants circumstanced alike. *Cf. UAW v. NLRB,* 148 U.S.App.D.C. 305, 317, 459 F.2d 1329, 1341 (1972). See also K. Davis, Administrative Law of the Seventies § 17.07–3 at 412 (1976) ("even if courts must tolerate some [agency] inconsistency, courts can still require (a) that administrators must strive for consistency, (b) that they must consider their own precedents when doing so is feasible, and (c) that when administrators depart from their own precedents they must normally explain why they do").

**14.** "Assuming that the Government made a mistake as to [another] in the application of [a] regulation, the law does not require the Government to perpetuate the mistake." *Texas Int'l Airlines v. CAB,* 147 U.S.App.D.C. 363, 366, 458 F.2d 782, 785 (1971).

**15.** See note 12 *supra.*

**16.** "[W]e cannot 'accept appellate counsel's *post hoc* rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141, 156 (1974), quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947).

sion set forth just what "substantial traffic" considerations were shown on the record in those cases, or else acknowledge them as decisional mishaps.

For three facets of petitioner's application, however, it did submit an analysis of movements through the gateway. Its request for authority to transport liquid chemicals from Birmingham, Alabama, directly to seventeen other states [17] reflected, in part at least, that during a 15-month period it had made from Birmingham through its gateways 205 trips to various parts of Tennessee, 27 to points in South Carolina, 32 to Fayetteville, North Carolina, 26 to Gary, Indiana, 19 to Yorkville, Ohio, nine to Radford, Virginia, and five or fewer to a clutch of other destinations. It received from the Commission direct authority to operate to Tennessee, South Carolina, Fayetteville, Gary and Yorkville, but not to Radford or other places.[18]

In regard to proposed authority to truck chemicals from a part of Tennessee to 22 states,[19] petitioner's traffic study manifested hauling equaling a yearly movement [20]

of 72 loads to Owensboro, Kentucky, 28 to East Point, Georgia, 20 to Belpre, Ohio, 16 to Mahrt, Alabama, and a smattering of others. It was allowed authority only to Owensboro.[21] Lastly, petitioner asked for authority to carry anhydrous ammonia from Memphis to over a dozen states,[22] and showed shipments at an annual rate [23] of 144 to Mississippi and 18 to Peach Orchard, Missouri. Permission was given solely with respect to Mississippi.[24] The basis for the Commission's distinction between the authority granted and that denied was that as to the former petitioner had transported "substantial traffic" [25] and as to the rest it had not.

The *Childress* test for gateway elimination aims for the benefits of a more direct route—very importantly, the savings resulting from diminished fuel consumption [26] —while preserving the competitive status quo.[27] Its rationale is simply that absent a showing of need, new service—or even such improvements in existing service as would radically alter its attractiveness to shippers [28]—"would dilute [*sic*] the traffic of

---

17. See Notice, MC–116254 (Sub. No. 144G), *supra* note 10.

18. *Chem-Haulers, Inc., Extension—Gateway Elimination, supra* note 9 (order of Dec. 9, 1975) (unreported).

19. See Notice, MC–116254 (Sub. No. 144G), *supra* note 10.

20. The figures adduced were for the traffic for one three-month period. We have extrapolated them to an annual basis so as to simplify the process of comparison undertaken in note 33 *infra.*

21. *Chem-Haulers, Inc., Extension—Gateway Elimination, supra* note 9 (order of Aug. 25, 1975) (unreported).

22. See Notice, MC–116254 (Sub. No. 144G), *supra* note 10.

23. These figures are derived from a four-month traffic study. See note 20 *supra.*

24. *Chem-Haulers, Inc., Extension—Gateway Elimination, supra* note 9 (order of Aug. 25, 1975) (unreported).

25. *Chem-Haulers, Inc., Extension—Gateway Elimination, supra* note 9 (order of Dec. 9, 1975) (unreported).

26. Indeed, the gateway elimination rules, discussed *supra* at notes 3–7 and accompanying text, were prompted by advisability of fuel conservation. See *Motor Common Carriers of Property, Routes and Service, supra* note 3, 116 M.C.C. at 535–537.

27. *Bowman Transp., Inc., Extension—Substitution of Gateways,* 100 M.C.C. 314, 331 (1965), *aff'd sub nom. Bowman Transp., Inc. v. United States,* 267 F.Supp 57 (D.Md.1967). *Cf. Curtis Keal Transp. Co., Inc., Extention—New Philadelphia, Ohio,* 73 M.C.C. 249, 253 (1957).

28. The narrow holding in *Childress* itself was that the applicant "has not been an effective competitor of existing direct-line carriers," and so "his proposed operation is tantamount to a new service." *Childress—Elimination of Sanford Gateway, supra* note 6, 61 M.C.C. at 429. *Cf. Yale Transp. Corp. v. United States,* 210 F.Supp. 862, 865 (S.D.N.Y.1962), *aff'd,* 373 U.S. 540, 83 S.Ct. 1537, 10 L.Ed.2d 687 (1963); *Bowman Transp., Inc., Extension—Substitution of Gateways, supra* note 27, 100 M.C.C. at 331; *Mason & Dixon Tank Lines, Inc., Extension—Elimination of Kingsport Gateway,* 91 M.C.C. 7, 15 (1961); *Youngblood Truck Lines, Inc., Elimination of Gateways in Henderson County, N. C.,* 89 M.C.C. 541, 544 (1961), *aff'd sub nom. Youngblood Truck Lines Inc. v. United States,*

existing carriers, [and] . . . to that extent would be disruptive of the competitive situation. . . ."[29] If an applicant "is actually transporting a substantial volume of traffic"[30] through the gateway, the direct service it would provide is viewed as comprehended in the status quo rather than as a potentially disturbing increment in the quantum of service. Not surprisingly, then, the Commission has held that "the measure of the substantiality of [an] applicant's penetration of [the] market is largely taken as its traffic volume therein as compared to protestants' traffic volume, with some adjustment to reflect the relative differences in size of the carriers."[31]

No one protested the three parts of petitioner's application which it in some wise substantiated. This does not mean, as petitioner intimates, that they should perforce have been granted, for the premise of *Childress* would seem to preclude certification where no showing of prior movements is made, and even as to these sections of petitioner's proposal that is largely the case. It does mean, however, that where petitioner has demonstrated that it had provided some service, the Commission is no more free to define "substantiality" by whim than it would have been had opposition existed.

Its disposition must invariably be predicated upon substantial evidence, and the line it draws must not be arbitrary or capricious.[32]

The foregoing summary of petitioner's traffic analyses implies that as to each part of its application the Commission's distinction between "substantial" and "insubstantial" traffic bears some relation to the number of shipments transported. A comparison of the Commission's action on one part with that on another indicates, however, that the Commission has not uniformly found an absolute number of trips to be substantial.[33] Indeed, the Commission informs us only that in a discrete instance "substantial" is more than "insubstantial," and its orders in this case, couched as they are in conclusory terms, tell us no more. If the record contained evidence of the frequency with which other carriers moved the same commodities between the various points at issue, comparison of that evidence with petitioner's showing might reveal the reasoning behind the Commission's decision.[34] But no such evidence appears, and for all we know petitioner alone may have performed the totality of the point-to-point services for which it now seeks direct authority.[35]

221 F.Supp. 809 (W.D.N.C.1963). See also *Engel Van Lines, Inc. v. United States,* 374 F.Supp. 1217, 1222 (D.N.J.1974).

**29.** *Bowman Transp., Inc., Extension—Substitution of Gateways, supra* note 27, 100 M.C.C. at 326. *Cf. Youngblood Truck Lines, Inc. v. United States, supra* note 28, 221 F.Supp. at 815; *Overnite Transp. Co. Elimination of Gateway— Monroe, N. C.,* 103 M.C.C. 135, 148 (1966); *Curtis Keal Transp. Co., Inc., Extension—New Philadelphia, Ohio, supra* note 27, 73 M.C.C. at 253.

**30.** *Childress—Elimination of Sanford Gateway, supra* note 6, 61 M.C.C. at 428, quoted in *Motor Common Carriers of Property, Routes and Service, supra* note 3, 116 M.C.C. at 536.

**31.** *Overnite Transp. Co. Elimination of Gateway—Monroe, N. C., supra* note 29, 103 M.C.C. at 148. Accord, *Blodgett Uncrated Furniture Serv., Inc. v. United States,* 288 F.Supp. 591, 595–597 (W.D.Mich.1968).

**32.** *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447, 455 (1974); *Burling-*

*ton Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207, 215–216 (1962) and cases there cited.

**33.** Converting petitioner's figures to an annual basis, one finds, for instance, that authority was denied between Memphis and Peach Orchard, Missouri (18 trips per year), but granted between Birmingham and Yorkville, Ohio (15 trips per year); and was granted between Birmingham and Gary (21 trips per year), but denied between New Johnsonville and East Point, Georgia (28 trips per year). See text *supra* at notes 17–24.

**34.** *Cf. Blodgett Uncrated Furniture Serv., Inc. v. United States, supra* note 31, 288 F.Supp. at 596–597.

**35.** The Commission's opinion accompanying the gateway elimination rules explicitly recognizes just such a possibility. *Motor Common Carriers of Property, Routes and Service, supra* note 3, 116 M.C.C. at 543.

With the record so bare, the only explanation we can conceive of for the Commission's action in this case is that petitioner was indulged direct authority between the points which the more substantial of its own operations had served, but was denied the privilege of traversing roads less travelled by, notwithstanding the possible lack or insubstantiality of service thereover by other carriers.[36] We need not now decide whether this rationale could amount to adequate justification, for even if we have correctly surmised the basis on which the Commission has proceeded, it clashes with its previous explications of the *Childress* doctrine.[37] If perchance the decision in the instant case represents a change of policy, the Commission must vouchsafe its whys and wherefores,[38] and it has not discharged that burden. So, however viewed, the Commission must give petitioner's case further consideration. Should the Commission then adhere to its previous course, it must provide a reasoned explanation supported· by substantial evidence in the record, either "as it presently exists or as supplemented by evidence relevant to the *status quo ante*." [39]

The order under review is accordingly vacated, and the case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

---

**36.** We notice judicially that the Commission has recently represented to this court that just such a method of weighing was employed in a similar case. Brief for Interstate Commerce Commission at 19, *Artim Transp. Sys., Inc. v. United States,* 181 U.S.App.D.C. 236, 556 F.2d 76 (*vacated and remanded,* 1977).

**37.** See notes 26–31 *supra* and accompanying text.

**38.** *Atchison, T. & S.F. R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350, 358 (1973) (Marshall, J.); *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852, *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). K. Davis, *supra* note 13, § 17.07–4 at 413–417.

**39.** *Ace Motor Freight, Inc. v. ICC,* 181 U.S.App. D.C. 236, 242, 557 F.2d 859, 865 (1977).