**R–W SERVICE SYSTEM, INC.,**
**Petitioner,**

**v.**

**The UNITED STATES of America and the Interstate Commerce Commission, Respondents,**

**Associated Truck Lines, Inc., et al., Intervenors.**

**No. 76–1538.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1977.

Decided Feb. 27, 1978.

Rehearing Denied April 13, 1978.

---

Petition for Review of an Order of the Interstate Commerce Commission.

Martin J. Leavitt, Northville, Mich., for petitioner.

John J. McCarthy, Jr., Atty., I.C.C., Washington, D. C., for respondent. Mark L. Evans, Gen. Counsel, I.C.C., Peter A. Fitzpatrick, Asst. Gen. Counsel, Mary C. Swann, Atty., I.C.C., Donald I. Baker, Asst. Atty. Gen., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Ronald J. Mastej, Detroit, Mich., for intervenors.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

Dissenting opinion filed by Chief Judge BAZELON.

TAMM, Circuit Judge:

Petitioner, R–W Service System, Inc. (R–W), appeals from an order[1] of the respondent Interstate Commerce Commission (Commission) dated April 27, 1976.[2]

R–W possesses regular route authority[3] to transport general commodities between

---

1. Intervening are Associated Truck Lines, Inc., Central Transport, Inc., Michigan Express, Inc., Holland Motor Express, Inc., Interstate Motor Freight System, The National Transit Corporation, United Trucking Service, Inc., McDuffee Motor Freight, Inc., and United Trucking of Kentucky, Inc. *See* Fed.R.App.P. 15(d).

2. Joint Appendix (J.A.) at 373.

3. "A regular-route motor carrier operates according to a predetermined plan, habitually uses certain fixed routes, operates between fixed termini, has terminals devoted to the expeditious handling of traffic, maintains a constant periodicity in service, and observes definite or published schedules or their equivalent. [Citations omitted]." Ex Parte No. 55 (Sub-No. 8), Motor Common Carriers of Property, Routes and Service, (Petition for the Elim-

Toledo, Ohio, and points in Indiana, Illinois, and Michigan. Additionally, R–W has irregular route authority to transport general commodities between Toledo and all points within the state of Ohio. By combining its regular route authority and its irregular route authority at Toledo, Ohio, R–W is able to transport general commodities between Ohio and points in Indiana, Illinois, and Michigan. However, the commodities must physically pass through the "gateway" of Toledo. To the extent that a carrier's operations are thus "tacked," there is, of course, no underlying determination of public convenience and necessity upon which the extended operation is predicated.[4]

By application of July 6, 1973, R–W sought a certificate of public convenience and necessity for irregular routes between all points in Ohio, on the one hand, and three Indiana points,[5] on the other. The matter was directed to Review Board Number 3 for disposition under the so-called "modified procedure." *See* 49 C.F.R. §§ 1100.45–.54 (1976). In its decision, the Review Board noted that the practical effect of R–W's proposal was elimination of the Toledo gateway. No. MC–55896 [Sub-No. 41], *R–W Service System, Inc., Extension—Additional Gateways,* Doc. # 103 at 16; Joint Appendix (J.A.) at 268. Therefore, its analysis was directed not only toward traditional public necessity and convenience criteria, but also toward the now familiar gateway elimination criteria of

*Childress—Elimination Sanford Gateway,* 61 M.C.C. 421 (1952).[6]

R–W's application was rejected on both grounds. No. MC–55896 [Sub-No. 41], *R–W Service System, Inc., Extension—Additional Gateways,* Doc. # 103 at 15–25, J.A. at 267–77. R–W filed a petition for reconsideration. J.A. at 294–314. At this stage, R–W mounted essentially a two-pronged attack. First, it attempted to amend its application, arguing that the amended application met the *Childress* criteria. Second, it argued that certain expressed National Transportation Policy considerations [7] and regulations thereunder had not been applied to R–W, and it had therefore been subject to arbitrary, capricious, and discriminatory treatment. R–W's petition was denied by order of the Commission bearing service date of April 27, 1976. J.A. at 373.

It is the latter of the arguments which R–W emphasized in its petition for reconsideration that it urges most fervently on appeal. The basis of R–W's argument is that, by regulation, the Commission has allowed "gateways" to be eliminated where the bypass will save less than twenty percent of the mileage through the gateway in instances where two irregular route authorities are tacked. 49 C.F.R. § 1065 (1976); Ex Parte No. 55 (Sub-No. 8), *Motor Common Carriers of Property, Routes and Ser-*

---

ination of Gateways by Rulemaking), 119 M.C.C. 170, 178 (1973).

4. It is thus said that "inefficiencies resulting from this type of operation are of the carrier's own choosing, and the mere fact of such operation is no assurance of need for such service or of economy and efficiency of operation." Bowman Transportation, Inc., Extension—Substitution of Gateways, 100 M.C.C. 314, 326 (1965).

5. The three Indiana points (Fort Wayne, Richmond, and Union City) were to serve as additional gateways.

6. The Childress—Elimination Sanford Gateway, 61 M.C.C. 421 (1952), criteria are
　(1) whether applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing

with the existing carriers, and (2) whether the elimination of the gateway requirement would enable applicant to institute a new service or a service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers.
　61 M.C.C at 428.

7. The National Transportation Policy provides, in part, "It is hereby declared to be the national transportation policy of the Congress . . . to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation . . . ." 49 U.S.C., preceding § 1, § 301, § 901, § 1001 (1970). *See also* Ex Parte No. 55 (Sub-No. 8), Motor Common Carriers of Property, Routes and Service, (Petition for the Elimination of Gateways by Rulemaking), 119 M.C.C. 530, 531–33 (1974).

*vice,* (Petition for the Elimination of Gateways by Rulemaking), 119 M.C.C. 530 (1974). The *Superhighway and Deviation Rules,* 49 C.F.R. § 1042 (1976), were amended so that carriers tacking two regular routes could operate under a twenty percent circuity rule as opposed to the former fifteen percent rule. *See* 40 Fed.Reg. 24906 (1975); Ex Parte No. MC–65 (Sub-No. 5), *Petition for Enlargement of the Amount of Operational Circuity Reduction Permitted Under Certain Provisions of the Property Motor Carrier Superhighway and Deviation Rules,* 121 M.C.C. 685 (1975).

■ R–W believes that, even in the absence of a promulgated regulation permitting a similar procedure for a carrier that combines regular and irregular route authorities, the same twenty percent rule should apply to its own petition. However, Ex Parte No. 55 specifically excludes from coverage situations where regular and irregular route authorities are tacked, 119 M.C.C. at 547–48, and the Review Board was cognizant of this in its decision. No. MC–55896 [Sub-No. 41], *R–W Service System, Inc., Extension—Additional Gateways,* Doc. # 103, at 15 n. 4, J.A. at 267 n. 4. We cannot agree that the failure to apply this regulation, inapplicable by the terms of its own promulgation, is an abuse of discretion, nor do we believe that the failure to extend the regulations to carriers tacking regular and irregular routes is impermissible. *See United States v. Florida East Coast Railway,* 410 U.S. 224, 246, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

■ Finally, it is important to note that the Review Board did explicitly consider energy and efficiency policies as a factor in reaching its conclusion. No. MC–55896 [Sub-No. 41], *R–W Service System, Inc., Extension—Additional Gateways,* Doc. # 103 at 25, J.A. at 277. Whereas, for obvious practical reasons, it is true that the Board is "precluded in ordinary circumstances from affording this factor any overwhelming weight in certification proceed-

ings," *id.,* there can be no doubt that the Board was well aware of these policies when it rejected R–W's application, and its decision to minimize the weight given to this factor was quite conscious.

We affirm.[8]

*Affirmed.*

BAZELON, Chief Judge, dissenting:

The majority today sustains an action of the Interstate Commerce Commission (Commission or ICC), even though the Commission has provided no explanation for rejecting one of petitioner's principal arguments in the proceedings below. Because there is no suggestion that this argument was "so frivolous or so lacking in substance as to permit the Commission to treat [it] in a perfunctory manner," *Humboldt Express, Inc. v. ICC,* 186 U.S.App.D.C. 141, at 144, 567 F.2d 1134, at 1137 (1977), I can only conclude that the majority's action constitutes an abdication of our responsibilities as a reviewing court. *Id.*

I.

R–W Service System, Inc. (R–W), petitioner herein, is a trucking firm with operating authority in Indiana, Illinois, Michigan, and Ohio. It is certified as a regular route carrier of general commodities in Indiana, Illinois and Michigan, and as an irregular route carrier in Ohio. R–W extends the scope of its operations by "tacking" its irregular route authority in Ohio with its regular route structure in Indiana, Illinois and Michigan through the common terminal, or "gateway," of Toledo, Ohio.

On July 6, 1973, R–W filed an application with the ICC seeking authority to operate between Ohio and Indiana through three additional gateways, Fort Wayne, Union City, and Richmond, Indiana. The application was opposed by a number of competing trucking companies, which are intervenors

---

8. We likewise see no merit in petitioner's contention that it is entitled to relief under the *Childress* criteria.

herein.[1] Initially, R–W sought to have its application assessed either as an application for new operating authority under the traditional public convenience and necessity standard, or as a gateway elimination application under the criteria set forth in *G. N. Childress—Elimination Sanford Gateway,* 61 M.C.C. 421 (1952) *(Childress).*[2] Virtually all of the evidence submitted by R–W purported to show that it satisfied the *Childress* criteria and that it should thus be permitted to "eliminate" the Toledo gateway by adding the three new gateways.

On February 15, 1974, after R–W had filed its application, the ICC promulgated new regulations concerning gateway elimination. *Motor Carriers of Property, Routes and Service (Petition for Elimination of Gateways by Rule-Making), Ex Parte No. 55 (Sub-No. 8),* 119 M.C.C. 530 (1974) *(Gateway Elimination Rules ).*[3] These regulations were designed to help alleviate the Nation's energy shortage. Their object was "to eliminate such gateway operations as may result in inefficiencies and wasteful expenditures of time, money, effort, and precious fuel," *id.* at 537, while preserving the "relatively stable competitive balance" in the surface transportation industry. *Id.* The Commission estimated that the new regulations would save some 300 million gallons of fuel annually. *Id.* at 532.

Essentially, the regulations required all motor carriers tacking irregular and irregular route authority to adopt the most direct route available (thereby eliminating gateways)—provided the bypass would save not more than 20% of the total mileage involved in operating through the gateway. If direct operation would save more than 20% of the total mileage through the gateway, then further tacking was prohibited unless the carrier could specifically show it satisfied the *Childress* criteria. For convenience, I will refer to this as the 20% circuity reduction principle.

Although by their terms the *Gateway Elimination Rules* did not apply to carriers such as R–W tacking irregular and regular route authority, R–W called attention to the 20% circuity reduction principle of the new regulations in pleadings before the Commission. R–W Reply to Memorandum of Law of Intervenors, J.A. 194–97; 216–22. R–W recognized that the specific procedures established by the *Gateway Elimination Rules* did not apply to it, but contended that the policy considerations underlying the 20% principle—energy conservation, environmental protection, and consumer savings on one hand, preservation of competitive equilibrium on the other—were equally applicable in its case. Accordingly, it suggested that to the extent its application involved 20% or less mileage reduction, it should be granted forthwith; to the extent it involved more than 20% mileage reduction it should be measured under the *Childress* criteria. J.A. 194–95. R–W also argued that the *Gateway Elimination Rules* indicated the Commission would not object to gateway elimination as to only part of an irregular route system. Therefore, it stated that it would "not object" if the Commission granted its application only between

---

1. The intervenors are Associated Truck Lines, Inc., Central Transport, Inc., Michigan Express, Inc., Holland Motor Express, Inc., Interstate Motor Freight System, The National Transit Corporation, United Trucking Service, Inc., McDuffee Motor Freight, Inc. and United Trucking of Kentucky, Inc.

2. The essential facts to be established are (1) whether applicant is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway and, in so operating, is effectively and efficiently competing with the existing carriers, and (2) whether the elimination of the gateway requirement would enable applicant to institute a new service or a

service so different from that presently provided as to materially improve applicant's competitive position to the detriment of existing carriers.

61 M.C.C. at 148. Although the burden is on the applicant to establish that it has satisfied the *Childress* criteria, it need not show that the award of direct authority is required by the public convenience and necessity.

3. *See Thompson Van Lines, Inc. v. United States,* 381 F.Supp. 184 (D.D.C.1974); *Thompson Van Lines, Inc. v. United States,* 399 F.Supp. 1131 (D.D.C.1975), *aff'd per curiam,* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976).

Fort Wayne, Richmond, and Union City, Indiana and points in Ohio north of U.S. Highway 40. J.A. 221.

On May 21, 1975, while R–W's application was still pending, the ICC promulgated a second new set of regulations, this time governing the amount of. deviation from authorized routes permitted to regular route carriers. *Petition for Enlargement of the Amount of Operational Circuity Reduction Permitted Under Certain Provisions of the Property Motor Carrier Superhighway and Deviation Rules, Ex Parte No. 65 (Sub-No. 5),* 121 M.C.C. 685 (1975) *(Superhighway and Deviation Rules).* These regulations increased the amount of regular route operational circuity permitted under ordinary circumstances from 15% to 20%. The *Superhighway and Deviation Rules,* like the *Gateway Elimination Rules,* were premised on the need to conserve fuel, preserve the environment, and lower consumer costs, without upsetting the balance of competition. *Id.* at 699. Significantly, the Commission also found that "approval of these rule changes would serve the equitable purpose of tending to equalize whatever disparity may presently exist between regular- and irregular-route motor common carriers of property as to permissible reduction in operational circuity as a result of the previously described '20-percent' circuity reduction regulation recently adopted by this Commission [in the *Gateway Elimination Rules*]." *Id.* at 699–700. Again, however, carriers tacking regular and irregular route authority were excluded from the new regulations. *Id.* at 703–04.

On June 19, 1975, the ICC rejected R–W's application in its entirety. The Commission found that R–W had failed to establish either that it met the *Childress* gateway elimination criteria, or that a grant of new route authority would be in the public convenience and necessity. The Commission rejected in a single sentence R–W's suggestion that its application be granted only as to northern Ohio, noting that there were "few commodities with respect to which testimony has been adduced" and that "some significant restructuring of applicant's operations to the detriment of exist-

ing carriers" would result. J.A. 276. The relevance of the 20% circuity reduction principle of the *Gateway Elimination Rules* and the *Superhighway and Deviation Rules* was dismissed in a sentence and a footnote:

> The usual inefficiencies resulting from [joining two separate grants of authority at a gateway] are therefore considered to be of a carrier's own choosing and the mere fact of such operation is no assurance of the existence of a need therefore.[4]

[4] This concept has undergone apparent modification in cases where carrier operations involve the tacking of separate grants of irregular route authority by virtue of the decision in *Gateway Elimination,* 119 M.C.C. 530 (1974). It was specifically held therein at pages 547–48, however, that rules allowing the avoidance of gateways in certain instances would not extend to operations involving the tacking of regular and irregular route authority such as those performed by applicant. From this we infer that traditional considerations governing the disposition of proposals to provide service between points in a more direct manner by carriers tacking regular and irregular route authority remain applicable.

J.A. 267. No explanation was provided as to why the energy-environment-inflation policies of the *Gateway Elimination Rules* and the *Superhighway and Deviation Rules* did not apply to the same extent to regular-irregular route carriers, or why regular-irregular route carriers were distinguishable from irregular-irregular route carriers and regular-regular route carriers.

On August 19, 1975, R–W petitioned the ICC for reconsideration. R–W vigorously argued that the Commission's decision was inconsistent with the resolution of competing policies enunciated in the *Gateway Elimination Rules* and the *Superhighway and Deviation Rules,* and that the failure to permit at least 20% circuity reduction to regular-irregular carriers was arbitrary and capricious discrimination. Moreover, R–W explicitly amended its application to include only cities north of U.S. Highway 40 in Ohio. It maintained that 85% of the points covered by this amended application represented less than 20% mileage reduction, and that all other points in this area satisfied the *Childress* criteria. J.A. 303 n. 1.

On April 19, 1976, the ICC denied R–W's application for reconsideration in a short-form Order that simply stated that "no sufficient cause exists for reopening the proceeding for acceptance of the proffered amendment, or for granting any of the relief sought." J.A. 373.

Subsequent to the denial of reconsideration, the ICC promulgated a third set of new regulations designed to increase the amount of permissible operational circuity. *Investigation to Consider Further Modification of the Piggy Back Service Regulations Ex Parte No. 230 (Sub-No. 4),* —— M.C.C. —— (1976). These regulations increased the amount of permissible circuity reduction from 15% to 20% for any type of motor carrier (regular route or irregular route) connecting with rail carriers offering top of the freight car (TOFC) or piggy-back services. After these regulations, then, the resolution of competing policies embodied in the 20% circuity reduction principle had been extended to carriers joining irregular and irregular route authority, regular and regular route authority, and regular or irregular route authority and TOFC authority. Only carriers joining regular and irregular route authority, such as R–W, had not been included.

## II.

On appeal, R–W strenuously argues that the Commission acted arbitrarily and capriciously in refusing, *without explanation,* to extend the 20% circuity reduction principle to carriers tacking regular and irregular route authority. Less vigorously, R–W also contends that the Commission's determination that it failed to satisfy the *Childress* criteria is not supported by substantial evidence. I think the Commission's conclusion that R–W failed to satisfy the *Childress*

criteria is supported by substantial evidence and would affirm this aspect of the Commission's decision. But I agree with R–W's alternative contention that the Commission provided no explanation for not applying the 20% circuity reduction principle in its case.

It is well established that the scope of review under the "arbitrary and capricious" standard is a narrow one. *Bowman Transportation, Inc. v. Arkansas-Best Freight Sys.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Although the inquiry of the reviewing court must be "searching and careful," *Citizens of Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), "[t]he court is not empowered to substitute its judgment for that of the agency." *Id.* In exercising this limited review, however, we have recognized that it is fundamental to reasoned decisionmaking that an agency "take pains to reconcile an apparent difference in the treatment accorded litigants circumstanced alike." *Garrett v. FCC,* 168 U.S. App.D.C. 266, 270, 513 F.2d 1056, 1060 (1975) (citing cases). This principle of consistency or evenhandedness applies no less to ICC gateway elimination proceedings. *Frozen Food Express, Inc. v. United States,* 535 F.2d 877, 880 (5th Cir. 1976); *Chem-Haulers, Inc. v. ICC,* 184 U.S.App.D.C. 153, 565 F.2d 728 (1977).

Here the Commission observed that the specific procedures of the *Gateway Elimination Rules* did not apply to carriers tacking regular and irregular route service. J.A. 267. However, it never explained why the particular resolution of competing policies embodied in these regulations, and the *Superhighway and Deviation Rules,* did not apply to such carriers.[4] There may well be

---

4. The majority suggests that, if the Commission did not explicitly address the applicability of the 20% circuity reduction principle, it nevertheless considered energy and efficiency factors. Maj. op. at —— of 188 U.S.App.D.C., at 489 of 580 F.2d. The passage referred to reads as follows:

[T]here remain for conclusory consideration several ancillary factors not hitherto mentioned. As stated, the Commission is inter-

ested in promoting efficient, stable carrier operations. If emphasis were placed only on efficiencies in applicant's present operations it would be possible to question whether an unfavorable disposition of this proposal serves to forward these objectives. A consideration of the entire transportation picture relative to the involved traffic, however, demonstrates that a favorable decision herein could well reduce the efficiency of other ex-

a rational basis for not extending the 20% circuity reduction principle to regular-irregular carriers.[5] But this court may not supply a reasoned basis for the Commission's action. *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947). If the Commission has not provided an adequate explanation for the differential treatment of regular-irregular and other types of carriers, its order cannot be sustained.

The Government suggests that the explanation for the Commission's refusal to extend the 20% rule to regular-irregular carriers is to be found not in the record in this case, but in the *Gateway Elimination Rules.* Gov.Br. at 16. The passage upon which the Government relies reads in its entirety as follows:

*Not applicable to regular routes.* —Some parties urge us not to apply the proposed rules to carriers joining grants of irregular- and regular-route authority. We agree with such contentions. Upon further reflection, we are persuaded that the proposed rules would not be conducive to regular-route operations, *but would cause the latter operations to lose their character as regular-route services.* As we stated at pages 178 and 179 of our Notice:

The instant proceeding is concerned only with irregular-route motor common carriers. A regular-route motor carrier operates according to a predetermined plan, habitually uses certain fixed routes, operates between fixed termini, has terminals devoted to the expeditious handling of traffic, maintains a constant periodicity in service, and observes definite or published schedules or their equivalent. [Citations omitted.] In any event, regular-route carriers are permitted to traverse shorter routes under specific circumstances pursuant to this Commission's Superhighway and Deviation rules (49 CFR 1042) or by the filing of specific alternate-route applications.

119 M.C.C. 547–48 (emphasis added; footnote omitted). Thus, the sole reason provided in the *Gateway Elimination Rules* for not applying the 20% circuity reduction principle to regular-irregular route carriers was the need to preserve the character of

---

isting carriers to such an extent that no net gain whatever in reduction of fuel consumption would result. It is because of the difficulty, if not impossibility, in quantifying such energy related matters that we are precluded in ordinary circumstances from affording this factor any overwhelming weight in certification proceedings.

J.A. 277. This only states that the Commission found it "impossible" to give energy conservation "overwhelming weight" in certification proceedings. There is no indication that the Commission considered whether energy factors, not to mention environmental and consumer concerns, could be partially realized through compromise relief such as the 20% circuity reduction principle. Moreover, the quoted passage is, to say the least, unpersuasive on its face. The Commission provided no support for the proposition that an improvement in R–W's efficiency could diminish the *efficiency,* as opposed to economic well-being, of competing carriers.

5. Intervenors suggest that the *Gateway Elimination Rules* did not modify the criteria or burden of proof set forth in the *Childress* decision. Int.Br. at 27–30. This contention is untenable. Although the Commission stated that the *Childress* criteria were some of the factors it considered in adopting the *Gateway Elimination Rules,* 119 M.C.C. at 536, it noted that it was applying these factors "on a national scale." *Id.* Elsewhere, the Commission observed that the new regulations represented "important changes in our basic approach to motor carrier tacking and the resulting gateway operations." *Id.* at 532. In any event, the contention that the criteria for gateway elimination are the same under the 20% circuity reduction principle and the *Childress* case is refuted by a simple comparison of the two. The *Childress* criteria are set forth in note 2, *supra.* Under the *Gateway Elimination Rules,* a carrier operating through a gateway where the direct route would save up to 20% of the mileage through the gateway had only to:

(a) file a letter with the ICC indicating the gateway to be eliminated;

(b) submit proof that through service via the gateway was provided or authorized as of November 23, 1973;

(c) wait 15 days following publication in the Federal Register.

*See* 49 C.F.R. § 1065.1(d)(1) (1976).

*regular route* services.[6]  Presumably, the Commission felt that if a carrier engaged in regular route operations could deviate from its designated route up to 20%, then the very nature of motor carrier services operating over "fixed routes" between "fixed termini" would be undermined.

Without more, I might be inclined to find this an adequate basis for excluding regular-irregular carriers from the 20% rule. However, this explanation was effectively negated by the *Superhighway and Deviation Rules*.  There, as noted above, the Commission extended the scope of operational circuity reduction permitted to regular route carriers from 15% to 20%.  In so doing, it essentially reversed the position adopted in the *Gateway Elimination Rules* that permitting up to 20% operational circuity reduction to regular route carriers would cause such operations "to lose their character as regular-route services."  119 M.C.C. at 547.

As in the *Gateway Elimination Rules,* one of the participants in the *Superhighway and Deviation Rules* questioned whether the 20% rule should be extended to regular-irregular carriers.  M & M Transportation Company argued that since neither *Gateway Elimination Rules* nor the proposed superhighway and deviation rules applied to carriers joining regular and irregular route services, the proposed rules should be amended to cover such carriers "as a matter of equity."  121 M.C.C. at 702–04.  The Commission gave three reasons for not granting this relief.  First, the requested relief was beyond the scope of the proceeding, which was concerned only with modifications in the superhighway and deviation rules applicable to regular route carriers. *Id.* at 703.  Second, there was "absolutely no persuasive evidence of record in this proceeding which would warrant a finding that the extraordinary, comprehensive relief described by M & M is required by the

present or future public convenience and necessity and that such relief should be granted."  *Id.*  And third, specific relief "on a case-by-case basis" was available, by, among other means, filing an application for gateway elimination.  *Id.* at 703–04.

All three of these reasons are specific to the *Superhighway and Deviation Rules* proceeding and cannot serve to explain the Commission's action in this case.  Here, unlike the *Superhighway and Deviation Rules* proceeding, the question of extending the 20% circuity reduction principle to a carrier joining regular and irregular route authority is squarely raised and is clearly within the scope of the proceeding.  Moreover, here, unlike the *Superhighway and Deviation Rules* proceeding, there has been no finding by the Commission that the carrier's request is unsupported by "persuasive evidence of record."  Finally, here, unlike the *Superhighway and Deviation Rules* proceeding, the carrier *is* attempting to obtain specific relief on a case-by-case basis.  Of course, the Commission may have changed its mind and have decided that the issue raised by R–W would best be resolved by rulemaking, rather than adjudication.  But it did not say this was its reason for denying the requested relief.  Instead, the Commission provided no explanation at all.  The most generous interpretation of the Commission's decision is that, through a single footnote, it incorporates by reference the rationale of the *Gateway Elimination Rules* —a rationale that was no longer viable.

I can only hope that the court has not abandoned what it recently said in *Humboldt Express, Inc. v. ICC,* 186 U.S.App.D.C. 141, 567 F.2d 1134 (1977):

The inadequate explanation accorded this particular administrative action gives us no opportunity for intelligent review.  Instead, this court is left with a dilemma: we could uncritically approve the agency action, which would amount to a failure

---

**6.**  Indeed, it is difficult to see how circuity reduction could threaten the nature of *irregular* route service.  Although the Commission has been concerned with the need to preserve the nature of irregular route service when regular and irregular routes are tacked, *see* Motor Common Carriers of Property, Routes and Service, 88 M.C.C. 415, 435 (1961), the threat to irregular route service would seem to come from the very fact of *tacking* with regular routes, not from the amount (if any) of operational circuity reduction allowed.

to perform properly the duty of a reviewing court. On the other hand, we could search out this matter on our own, which would very probably result in the substitution of a judicial judgment for an administrative judgment. This dilemma can be avoided only if agencies provide an adequate explanation of the basis for the actions which they take.

186 U.S.App.D.C. at 144, 567 F.2d at 1137. Because I believe the majority's affirmance in this case amounts to the failure to perform properly the duty of a reviewing court, I respectfully dissent.